There are a lot of issues here, so I don't think we'll keep the time balanced for both parties, but I don't think that you need to be worried about your 8-7 split. Thank you, Your Honor. May it please the Court, I'd like to begin, if I may, with the claim construction issue regarding bandwidth. The District Court's construction, which incorporated a temporal limitation, was error for two reasons. The first is that it's inconsistent with the specification, and the second is it would exclude the commercial embodiment of this patent for Wyman Extended. I'd like to begin with the specification. The specification talks about bandwidth from two different perspectives, and the claim construction must encompass them both. It must be consistent between the two. One perspective is from the base station's perspective, when it is allocating bandwidth, and one perspective is from the phone's or subscriber unit's perspective, where it is requesting bandwidth. It is undisputed, I believe, that from the subscriber unit, the phone's perspective, when it requests bandwidth, it does so without a request for something that is temporal in the specification. It requests it by bytes. More specifically, what it does is to report to the base station the number of bytes it has in its uplink queue, and that is what the, that is in the specification, what is determined to be a bandwidth request. There are three parts of the specification to which I would direct Your Honors regarding the phone's or subscriber unit's perspective regarding bandwidth. The first is figure 11. Figure 11 expressly refers to, as part of the flow chart, unused bytes in the current allocation. Do you need to succeed on your construction of bandwidth to prevail on your arguments about why the summary judgment related to infringement should be reversed? No. All you need is a genuine answer here. There are three genuine issues regarding infringement even under the erroneous construction, and I'm happy to jump to that if Your Honors would like to. Do you maybe have any questions for him on bandwidth? No. You might want to jump to that. The three disputes of fact regarding the erroneous construction are, first, the question of whether the BSR that is sent in the accused device is a quote-unquote request. The argument that is made here is a semantic one, that it's called a report, not a request. There is, I think, no fair dispute that in the context of the system, the accused system, the report is considered to be a request by the base station. As Professor Min explained, the entire purpose of the BSR is to tell the base station how many bytes are in the uplink queue for the phone. The phone has a certain number of bytes that it needs to send up to the base station, and that is exactly what the base station is interpreting it to be. This is the amount of bytes needed to be sent up, and the base station understands it needs to allocate bandwidth sufficient to transfer those bytes. That is the entire purpose. The semantic argument that is made, I think, is a fallacy. The example that we gave below is if my wife calls me at the end of the day and says, we're out of milk, that is technically a report, not a request. But I understand it to be, and it is certainly intended to be, a request that I bring milk on the way home. Oh no, it's not. It's intended to be an order. Even stronger than a request. And the context here is even stronger than that, because the context here is that this BSR, the thing that Erickson claims is not a request because it's called a report, is typically sent only after a scheduling request has been sent. The scheduling request is the one-bit message that the phone sends to the base station, which Erickson, by the way, concedes is a request because it's called one, saying I need bandwidth to send you a request. That is the entire purpose of the one-bit scheduling request, so that the base station knows that what it's going to be getting in the next period is a request for BSR. And the base station expressly allocates bandwidth for that BSR to come up, because in response to the scheduling request, it knows the phone needs to send data to the base station. I'm a little confused with your argument on bandwidth not having a time component, and then your argument that this is a request, because it seems to me that they're somewhat inconsistent. I mean, in a way, it's just because you're saying I need this data, and I need it in the next available time frame, but doesn't that automatically lead you to the conclusion that there must be a time component to bandwidth? One is a claim construction question, and one is an infringement question. Well, I get that. There has to be some consistency. No, one has to work with the other, but as a matter of claim construction, the term bandwidth does not itself have a temporal component. Obviously, inherently, everything we do in life is done in a period of time or over time. That's true, but that doesn't mean that the term bandwidth must have within it embedded a temporal limitation. It is, of course, true that bandwidth is allocated over time, and it is, of course, true that the data on the phone is sent over time. That doesn't mean that the term bandwidth has as part of its definition a temporal limitation. That's the point on claim construction. With regard to infringement, and these are, I think, totally consistent, with regard to infringement, the point is that even if you look at what the BSR is saying, and what the base station understands it to be, according to Professor Min, it is asking for that bandwidth to be sent in the next TTI, which is the time interval. So even if there were a temporal limitation, that's how the base station understands the BSR to be requesting, which is that bandwidth sufficient to send that data in the uplink queue in the next TTI. So they're consistent in the sense that temporal limitation isn't required, but if it were, it would be satisfied by that TTI portion. The second point that I wanted to make regarding this request issue, which is the first disputed factor on infringement, is that if the semantics matter, and I don't believe they do, what matters is how the base station in this context understands the BSR, and it understands it exactly the same way as the MILC analogy, it understands it to be a request, particularly in the context of having received the one-bit scheduling request. Let me give you a gripe about your citation of Min. It's a gripe, but it Further, WLAN's expert, Professor Min, explained that the dedicated channel, not RACH, is used in handover. A2747 in paragraph 253, A7248-49 in paragraph 257-58. Note to my clerk, no, dash, not there. And then clerk's initials. Can you find this end note? Because I looked through the record, found it at 3182SC. I shouldn't have to do that. You're right, I apologize. Going back to where you were, you say that Min says that it's clear that BSR requires the bandwidth to be delivered in the next TTI. What other than his testimony do you have to support that proposition? That's in the portions that he's citing, and let me show you what that is. And your Honor's addressing, just so we're clear, this is the second disputed fact we've moved to now. The first disputed fact is the semantic one regarding what's a request. The second is, if there's a temporal limitation, is it satisfied by this next TTI finding that second disputed fact. And so Professor Min is talking about the main dispute, the main portion, I think, Your Honor, would be what's called the RRM algorithm. And the RRM algorithm is Erickson's proprietary algorithm. A record citation for that is A2475, A2512. Those are two examples of places that are the actual algorithm as opposed to Professor Min's analysis of it. And what Professor Min did was examine that algorithm, and I'll just note for Your Honor's that Erickson has designated that highly, highly confidential, and that will give us details here, just as it constrained the redactions that you saw in Professor Min's report. But that is all driven by Erickson's designation of confidentiality. And what Professor Min analyzed was that section of their RRM, which is how they, as I say, their proprietary algorithm by which they decide how the base station is going to interact with the phone. And so I think the concise answer to Your Honor's question is that's the primary source material which he used. So with regard to the first question of request, I only wanted to make one more point regarding the semantic issue of whether the report is in fact a request in context. And that is that that's a good example of how their construction and the district court's application of that construction is inconsistent with the WIMAX standard to which this patent was directed. It's not limited to WIMAX, of course, but it was directed to WIMAX. And there is no dispute on this record that WIMAX is covered by the patent of the And yet the report in WIMAX is in bytes. It's not a request that says give me a particular bandwidth section according to the following time. It is in the same format as the accused format. So it is irreconcilably inconsistent for Erickson to claim both that WIMAX is covered and that their instantiation is not covered because the format of the request is the same. So on the second issue, with regard to this time integral question, even if there is such a limitation, is there a dispute of fact? We've covered Professor Min's report, which I think by itself raises a question of fact. But Erickson's response I think is interesting. Erickson's principal response is, and this is relied upon by the district court as well, is that the phone's request for data, the phone's statement to the base station that says I have X bytes of data in my uplink queue that need to go to you, that that is only one of several inputs that the base station uses to decide how much bandwidth actually to allocate to the phone. And that's true, but irrelevant. The claim itself says that the way this works is the phone tells the base station I need to send you X bytes. The base station, of course, has many competing phones competing for its bandwidth. It has to decide how much bandwidth it can allocate to each phone, and it may do so by the type of transmission, whether it's time sensitive or not or whatever. And the base station, based on those criteria, then allocates to the phone a certain amount of bandwidth. It may be the full amount of bandwidth that the phone requested. It may not be, depending on the other competing demands of that base station at that time. But that's not relevant to the claim. The claim specifically just says you're identifying the requested bandwidth. It doesn't speak to, and there's certainly no requirement, that the bandwidth that's requested be exactly the bandwidth that's allocated. And in fact, the claim itself specifically is inconsistent with that assumption. Do you want to address your anticipation argument at all? I definitely do, Your Honor. Okay, so generous with time has its limit. Let me just then identify the third dispute on infringement, which is doctrine of equivalence. Professor Min at A2665 laid out a function-way result analysis, which I think is unimpeached at this point, and that by itself raises a question of fact with regard to doctrine of equivalence. I never addressed that. True. Okay. It essentially just disregarded, did not address it on the merits at all. That is true. But there are two independent disputes of fact with regard to literal infringement as well. With regard to anticipation… Justice, let me, in anticipation, let me start you off. So, I'm having a hard time understanding how a new base station establishes a dedicated channel with a mobile device before the two units have been synchronized. The… Let me go to that. If something doesn't go over the random access channel, then how do you get to synchronization? Well, synchronization is a different thing than being able to send a message on a dedicated channel. And the GSM spec itself makes that clear, and Muli makes that clear. That's at 2424. So, synchronization occurs because messages are transmitted over the random access channel, right? That is true. Synchronization occurs after, but… After? Yes. Right. So, you have, in other words, you have the handover message that has to occur for an asynchronous handover. Yes. And then you have the physical information data sent back to the mobile device. Exactly. Okay. So, how is that first handover message not on a random access channel? What Muli and the GSM standard itself make clear is that you do not need synchronization in order to send that first access burst over the dedicated channel. They make it clear that you don't need it if you're already pre-synchronized. No. I disagree. That's a… And you're relying only on that one sentence? No. No, no. There's actually several places where that's true, Your Honor. A2409… Put aside Muli. Tell me in your own words how synchronization occurs if there has to be communication before you can have synchronization, including the return of the physical message. What… That has to be occurring over a random access channel, right? No. These… What happens… Well, there's two parts to the question. Let me answer it. The part that's relevant, I think, to the claim is, is it possible for that first handover reference message to be sent on a dedicated channel without synchronization having occurred first? Your expert says repeatedly that it's not. No, I think… Should we go to it? This isn't even a closed call, I don't think, in terms of what your expert says. You might try to back off a bit. But he says repeatedly that you have to have synchronization first before you can get on a dedicated channel. He doesn't say that as to the handover reference. There's actually nothing that says that as to a handover reference. And if you look at A2424… It says if it's a synchronous handover, then it's easier. Clearly, you know, you haven't lost your synchronization. But if it's asynchronous, then you obtain the synchronization first, and then you can use it on a dedicated channel. But not… He's not talking there about a handover reference. There's nothing that says a handover reference. And if you look at A2424, which is the actual standard that Muli is purporting to describe, it lays out how it works for synchronous and how it works for asynchronous. But for asynchronous, it says, assuming you've already established the channel. That's true, but it doesn't say you need to… It says exactly, after having switched to the assigned channel. So how do you get to the point of switching to assigned channels if your expert says you can't switch to those channels until you have synchronization? The expert said… There are portions, I believe, I agree with you, where the expert said something that could fairly be interpreted that way. He also said the opposite several places. At best, that's a credibility issue. I don't find anywhere that he said the opposite, and you don't cite anything where he says the opposite. You just say, well, maybe it's ambiguous, but you never cite to where he says the opposite. I think it is ambiguous, and it's… The exact opposite is where he says it is always sent on a dedicated channel, and he never says it's sent on a random access channel. He says that seven times. Okay. He says that seven times, and that's squarely inconsistent. That's what seven times. That in asynchronous and in both modes, the handover reference is only sent on a dedicated channel and moving. Well, he says if it's asynchronous, then you have to obtain the synchronization, and then you can use it afterward. That's for data. The question is, to the extent it's referring to access first being on a dedicated channel, it's either in a synchronous scenario or in a scenario where the synchronization takes place prior to that access first being sent on a dedicated channel. He says, yes, that's right. One of the portions of your point, I don't know if it's that one, was talking about a hypothetical that was set up by Erickson's counsel, where he was asking him to assume a set of facts that isn't true. Well, there's no hypothetical here that he's asking him to assume a set of facts. There isn't some of them. But in any event, it is squarely inconsistent with Professor Min's repeated statements that says, in synchronous and asynchronous, it is always sent on a dedicated channel. And it's inconsistent with moving. It's called a handshake, I believe. Handshake handover, exactly. So the question is not, yes, of course, you need synchronization to occur before data is sent, but you do not need it before that handshake signal is sent. And A2424 explains how you do that in asynchronous, which is, in synchronous, you only send it, I believe, four or five times. In asynchronous, you send it continuously. And that's over the dedicated channel. I'm sorry. Dr. Min is quoting from Mooley. He says, the mobile station is forbidden to transmit the data which is on a dedicated channel until the new timing is advanced. In other words, the synchronization is initiated. The data, exactly. That's not the handshake signal. That's the data. The sequence is handover reference sent on dedicated channel, then synchronization, then data is sent. That's clear in Mooley. It's clear in the GSM standard. And that's what, in other places, Professor Min testified about. What about the figure 6.3 of Mooley, where it shows that the handover reference, that there is an initial sending of the reference before the physical data, physical information goes back. That's the physical data again, yes, exactly. So there's a handover access first. Yes. All right. And that handover access can't be on the dedicated channel, because until you have the physical information sent back, you can't have synchronization. It is on a dedicated channel. That's what Mooley and GSM tell us on the pages that I've cited for you. 2409, 2424. That's exactly what Professor Min said elsewhere as well. And the fact that, and one of the points I wanted to make is that on this issue, the district court improperly resolved credibility disputes, both of them, against Wiley on summary judgment. He relied explicitly, in his opinion, on their expert, Mr. Lanning. Well, no, no. He actually relied on your expert, because he said, well, I'm crediting what Dr. Min said, and Dr. Min said in no uncertain terms that synchronization has to occur first. I would put it differently. I think that what he's relying upon is a portion of Professor Min's testimony, which is, as read, inconsistent with all of the rest of his testimony and his report. And at best, that raises a credibility issue that can't be resolved with summary judgment. There is no... And there's got to be, I understand that there has to be an issue of fact, but it's got to be a genuine issue of fact. It's got to be a real issue of fact. And if your expert walks away from the very argument you're making, both in terms of what he says Muley teaches and what he says has to occur, then how do you have a genuine issue of fact? My idea, of course, is that paragraph for which I was searching, and I thought it was important, that's 257, and then it's half a day. Exactly. Where he says, the handover reference disclosed by Muley is included in the handover access message, which is sent on a dedicated channel, not a random access channel. But he then talks about it in asynchronous, synchronous, etc. It's not that Professor Min walked away from his opinion. Not at all. What they're relying upon is one stray comment or a couple of stray comments in a long deposition against ten other comments in the same deposition that are inconsistent with it and ten other statements in his declaration that are inconsistent with it. And that creates, at most, a credibility question that can't be resolved in summary judgment. So tell me how synchronization occurs. Tell me how you see that 6.37 figure. Handover access occurs first, then physical information goes back. That's the only way you can get synchronization. So how can that first handover access be on a dedicated channel? Because you can set it on a dedicated channel before synchronization. That's what 824.24 tells us. And 24.09. And Professor Min elsewhere. And Muley. All the references in Muley that say you can't. And all Professor Min's testimonies that say you can't. Well, there's actually... You can also assume that those are all wrong. No. If we talk about Muley, there is no statement in Muley that says in asynchronous, the handover reference is sent over the rack. There are zero statements to that effect. Zero. There is one very clear statement in Muley that says in both synchronous and asynchronous, it's sent on a dedicated channel. So that one statement is not clear. I mean, even you argued that judges, you should at least find it to be ambiguous. That's what you said to the judges on their judgment. That's not clear. I think that statement is clear. Aren't there plenty of other places in Muley where it specifically says that you can't be on a dedicated channel until you are synchronized? Not for a handover reference. There's not a single statement to that effect. Not a single statement to that effect with regard to handover reference. And a single statement in Muley is squarely clear. It says in both synchronous and asynchronous, it is sent on a dedicated channel. That is unambiguous, and I think that's sufficient to find summary judgment of no anticipation. Okay, Mr. Powers. I think it's time for us to move on. Let's hear from Mr. Kuhn. Mr. I think that if I'm right, we're at about 23 minutes for Mr. Powers at this point. So why don't we put 25 minutes on the clock for Mr. Clement if he needs some, and we'll make certain that you have some rebuttal time depending on how much time is spent on the MSL issue that you raised. Okay. Thank you, Your Honors, and may it please the Court. The District Court correctly determined that the 437 patent was invalid and that the bandwidth patents were not infringed. Indeed, the District Court's only error was invalid misreading and indeed over-reading this Court's earlier decision about the scope of the PICRA, the settlement agreement between the parties. The District Court read this Court's decision as holding that as long as patents asserted here by liners were acquired after the PICRA was answered... You're starting with your MSL issue. Yeah. I mean, I'll start anywhere you want me to. I swear I planned to start, but I'm happy to start anywhere you want me to. Let me get... Even assuming that you're right that we were limiting our decision to the triggering mechanism, there's still a lot left to analyze, correct, with respect to that MSL provision? I think that's right. I mean, I think that what's left to analyze can still be resolved in our favor because I think they're legal questions, but on this issue, of course, we had summary judgment granted against us based on this legal conclusion that the triggering patents and the asserted patents were the same, and that's just wrong, I think. I mean, obviously, I can't tell this panel what this panel meant in its earlier decision. I can just read it, and it's a decision about a clause, and the clause, when it talks about patents, only talks about the triggering patents, and there was a separate dispute between the parties in the first case about if the clause is triggered, what's the scope of the license that's granted, and the way I read this court's decision is that you hold that a triggering patent has to be a pre-agreement patent, and that all the other issues that the parties were briefing for you, you don't need to decide. Assuming that's true, there would be three possible scenarios, then, in terms of how the MSL provision would work. You say it just opens up everything to any product that Erickson ever would make, right? Can you stop? You are being very distracting right now. I can't follow this exchange. Go ahead. Okay, right. That's your view. Assuming it's triggered, all bets are off, and Erickson can do anything that Belair would be allowed to do. Ultimately, right. I wouldn't put it in terms of all bets being off. I would put it in terms of exactly what 7.1 says, which is once you're triggered, then there's a right on behalf of my client to get a non-exclusive license, and it covers the products, LME products, and that's a defined term in the agreement. Why does it cover the products as to the relevant patent that triggers the provision? That's the part I'm not following. Why does it cover the products? I've got the language here, and I'm a plain language kind of gal, so I should be your friend in this case. Except that, I don't see that in the plain language. What I see is, with reference to the patent, it covers the product. With all due respect, Your Honor, I think you're reading those words into the scope part of 7.1. 7.1 says once the triggering provision is satisfied. Where does it say anything about triggering provision? I see it as a single provision. I don't see it as two provisions. One for triggering, and then a subsequent provision for application. I see a single provision. Where in this provision does it have this two-step process that you're suggesting? How is it that I read this as a two-step process? In fact, the entire thing you're pointing to is a single sentence. It's not even two sentences. It's not just one provision. It's one sentence. Sure, but there's a comma. I know, but there's everything that precedes the comma is what I would read as triggering clause. No, the first comma. At least as I've transcribed in my notes. Before the first comma, it says in the event that Wylan owns or controls the licensing of patents not already addressed under the agreement and which are infringed or alleged to be infringed by UMTS slash HIPAA products comma. I view that as the triggering clause. My friends on the other side don't even have an argument in this round of briefing that the triggering clause isn't satisfied by the 759 patent that they asserted against UMTS HIPAA products. We're at the comma. We're empowered. With all due respect, Your Honor, you would have to read those words in after the reference to products because after the comma, it then says Wylan hereby agrees that at any time during the term of this agreement, at LME's request comma, Wylan will grant to LME and its affiliates a non-exclusive license to make, import, etc., etc., LME products, including UMTS HIPAA products. So just stop there for a second. It doesn't say with respect to the triggering patent. Well, that's the only thing they can actually give. They can't actually give a license to make except under what? Under what can they give a license to make? Because I don't have the right to allow you to make. Maybe you need FDA approval. Maybe there are a hundred other companies with patents on your product. I can't give you a license to make. All I can give you is what I have and the only thing this sentence is talking about is particular patents that I have. With respect, Your Honor, first of all, I mean I want to get back to this point but first of all, I think that would basically read this provision to be almost meaningless. But second of all, it sounds like an argument that was made last time. It wasn't, Your Honor. You didn't get to this provision. It was made. Yeah, it was made and it was one of the arguments that you didn't reach. Okay, but it was made by both parties and I think we overwhelmingly have the better argument based on the text of this provision. And with respect to your question more broadly, Judge Moore, I think sure, they don't have a right to grant us a license to make irrespective of other federal laws. What they have is Irrespective of other people's patents? Right, right, but they have what they have here and in this sentence it says in the event that we land owns or controls the licensing of patents not already addressed. And we have interpreted that language as being limited to patents it owns at the time. Which the 759 patent is and they don't dispute so we have the trigger, Your Honor, and what they have a license to grant is a green light to make the patent the product with respect to all the patents they own. No, where does it say that? Where does it say that? It doesn't, Your Honor, but it doesn't say... You would like to read that language No, I don't have to. That language is not there. With all due respect, Your Honor, I don't need to read that in. And you need to read in. My friend needs to read in with respect to the triggering patent. And that's not in there. It says product. It's a single sentence. It's one sentence. And that one sentence begins by talking about patents that they already own. Whether you approve it or not that's where we are based on our fair process. No issue with that, Your Honor. The second half of the sentence then says and then we'll give you a license for products, to make products. It doesn't say to make products notwithstanding that patent. But we both agree that they can't give a license to make products. The license is to make products under something. And the only something that's discussed in this sentence is the patents that they already own. We can't give you a license to make. Don't you agree it's absurd for me to say you have a license to make something in patent law? No, I don't think it's absurd at all, Your Honor. And if you're talking about somebody How can I give you a license to make something? There could be other people that have patents on it. I can't insulate you from infringement. Absolutely, Your Honor. But if you have a whole basket of patents back there and you give me a license to make products, I would understand that to say you're standing down not just to one patent, but to the whole basket of patents you have back there. A whole basket of patents I currently own. Exactly. That is what this says. Well, now you're reading a different condition and a different argument that they're making and a different argument that the district court's making. He's making the argument He made the argument, the assumption that this only applies to the very trigger patent. Now, if you're saying that it applies to only the whole basket of patents, but only the basket of pre-existing patents that's an argument that they haven't made, and I don't see how you can read that in. I mean, now you're reading kind of language in with a caveat. Whereas, I mean, this is a clause that refers to a defined term in the agreement. The defined term in the agreement, LME products, is a defined term. And it means our products. It's broad. Your products, but let me ask you a question. Are LME products ever, are there LME products that could have just a component of the compliant product? In other words, could that just be a component? It could be a component, but if you wanted to limit it just to that component, you'd need some restrictive language. Well, that's what I'm wondering, because speaking of commas, there's one missing in the phrase that you want to point us to that says, LME products including and then it talks about the compliant product. And so the question is, is there some, is that reference meant to say that it's not, quote, including this other kind of product, but it's your products that happen to include compliant components? Well, I don't think so. I mean, I see the point you're making. But I think that, you know, here and, you know, I think in other places in the agreement, but I'd have to go back and look at the whole agreement. I think when it's referring to LME products, including UMTS HIPAA products, I don't think it's, you know, that that including is like a modifier of the LME products. And I think that would sort of defeat in context the distinction because another way of putting it is I think the way you're reading it, it would effectively read out LME products including because nobody's going to think that we're going to get a license to something that, you know, we're the reference, I think. So it's clearly got to be LME that we're talking about. So I think when it's saying LME products including UMTS HIPAA products, that's a definitive way of trying to say that it's all products. It's not just these products. Mr. Clement, I need a point of clarification. When you stood up, you said this is important because summary judgment was granted against us on this point. I want to ask you to clarify procedurally because I understood you to be appealing the district court's denial of your request for summary judgment on this point, but I didn't see a grant of summary judgment against you on this point. And I got my look and he can't find it either. So what am I missing? What you're missing is that, and there's confusion on this because we raised this both as a defense and as a counterclaim. And so when the district court issued his original opinion, he clearly rejected this as a defense. Wait, but you said your exact words were a grant of summary judgment against us in this case. Exactly. So is there a grant of summary judgment against you? Yes, on the counterclaims. And there was some ambiguity the way he dealt with it in the first opinion. So we went back and asked him to clarify, and he had a clarifying opinion where he ruled against us on summary judgment on our counterclaims. And so there's your answer. We amended our notice of appeal to take that up as well. So I don't think there's any ambiguity as to the procedural procedure as it comes up. As I understand it, you're saying that the scope of a license that they could and should afford you is the scope of the license that's outlined in the Bel Air license. Yeah, and to put it just in colloquial terms, it's a portfolio license. And if you go back to the beginning on this, when my client first found out that its lawyers were being used to sort of develop the case both against it and against the products more broadly, they had a very negative reaction to that. These were their lawyers that they'd spent... Okay, okay, but my only point other than to give you a little wind-up for this was to make the point that our initial offer was we want a portfolio license. Their initial offer... Everything else in this whole agreement, Section 2 says we justify you with respect to just the compliant patents, and then you've got the damages provision that the non-proof provision, which we said is limited to the WLAN compliant patents, and then you've got the damages provision that is limited to non-WLAN compliant patents. So all throughout we're talking about those products that are covered by the standards, right? Well, I think there are places where it talks about those, and when it does, it uses the defined terms UMTS, HSPA products. There are times when it uses L&E products more broadly, which is why that's also a defined term. So I don't think you can say the whole agreement is just about UMTS, HSPA products. I think what I would say though, where I was going with this, is just to say I don't think it's all that anomalous that this provision is drafted in a way that says, look, if you start asserting your other pre-existing patents against this technology, what we want is effectively, we want the blanket license that we wanted in the first place. But that's not what you're asking for. That's not what you're asking us to do. These patents at issue are not their other pre-existing patents. These patents at issue are later acquired patents, aren't they, actually? Am I understanding the facts right? Sure, but at the time of the original agreement, we were looking for a license, a portfolio license of exactly the scope we're asking for you today, and exactly the scope that they gave to Bel Air. And so we're not asking you something today that we didn't ask for in the beginning. And, you know, as you would expect when one party comes in and says we really want these McCool lawyers, we'll lay off you with these four patents. And we come back and say that's not nearly good enough. If you want our lawyers, who were on record as basically saying if we couldn't come to agreement, they were walking away from Wiley. So we were in the driver's seat in the negotiations. We said we want the whole thing. We want a portfolio license that would cover everything. And what the parties negotiated to is an arrangement that I think in the context of that makes perfect sense, which is, alright, we're not sure what's in the basket of currently existing patents, but if it turns out that you're going to assert those against UMTS HIPAA products, then here's the deal. We're going to basically get the license, the portfolio license we were asking for, and we will give you, Wiley, an advantage that we wouldn't have if we were just negotiating this right now in a blank slate, which is we'll let you essentially pick the terms. So they didn't have to go out and make this license with Bel Air. And if I were advising them in light of this agreement, I would have probably said don't do that. Make it a per product license or something so you don't run into this problem. If you were advising them, you would have written the agreement a lot more clearly. I think that's true as a general matter, Your Honor. I'm not sure I would have written this particular provision that much differently, at least if what I was trying to accomplish is what I'm saying they were trying to accomplish, because again, with all that... You wouldn't have written this provision differently even now at this point in our discussion? Well, I mean, sure. I mean, look, but here's the point, Your Honor. Sure, I'd add a comma to address Judge O'Malley. I mean, look, what you're saying is it would benefit a hindsight based on this oral argument? Sure. But what I'd be doing is I would be adding words that with all due respect I think would be superfluous, because when I have a license for products... Don't you think, and it says including UMTS HSPA products, don't you think that means under this agreement all LME products, right? All of them. Every single product. And I think that because it's a defined term. Sure. Isn't that a fair reading? Sure. It's more than a fair reading. It's a defined term. Okay, but so your view is that the first half, which is the triggering event, which says triggered, if it turns out there might be a patent that could infringe a UMTS slash HSPA product. Okay? So there could be a triggering event because we learned that's a patent that infringes this one subset of LME products. Your view is then Erickson has a license for every other LME product it makes, even if it does not contain UMTS HSPA technology. They could start making dishwashers. And if WLAN has a patent on a dishwasher and some triggering event occurs in a bizarre universe, you've got a most favored license now on the dishwasher. Right? That's your argument. Just to make sure I understand the logical consequences of what you're asking for. Absolutely, Your Honor. But you know what? If Bel Air's got a dishwasher and there are no dishwasher patents, but if they have a dishwasher, they get to do it and they get to do it all with a license for $300,000 Canadian. Even if that has nothing to do with a UMTS type product. But keep in mind, Your Honor. If everything WLAN ever develops technology in or obtains a patent for in the future, Erickson gets a free pass on all of it if they license it to anyone else. It's not a free pass. It's a pass on the terms that they decide for themselves based on their negotiation with another disinterested party. And with respect, before you think that that's too much to ask, think about the dynamic of the negotiation here. Well, the dynamic of the negotiation at best gets you ambiguity which gets you back into a parole evidence scenario for the contract because I'm certainly not going to sit here and evaluate the context of the negotiation. That's not part of contract interpretation for me. Okay, but I guess the reason I think it may be relevant to you right now is I understand this colloquy irritably to my side. I think what it's saying is, yeah, you might have a point on the plain language, but that just seems like they've just given away the store. And that seems crazy to me. And I'm just telling you, and if you need to send this back to the judge for him to get more depositions on this, that's a better result than where I'm sitting right now. But the reality is, that's not a crazy result given the bargaining power my client had, and specifically, they were concerned about exactly this. They were taking this back to the first year of law school and arguing against the existence of a contract of adhesion. It's not a contract of adhesion. Think about it this way, Your Honor. I mean, I just don't think it would be a contract of adhesion or even a particularly bad deal if they'd given the blanket license, which we were asking for. I made a comment 15 minutes ago about prior arguments because it seems to me there's a considerable amount of discussion to be had about other aspects of this case. And we're down to 535 and we're still on the most favored question. Well, I'm happy to move on, and I take the hint to do just that, so I will. But I would say that we lost our counterclaim definitively, and if I take the import of your question, we should at least get a remand so we can get into the parole evidence in front of the district court judge, who I think was clearly over-reading and misreading this court's decision. But let me then take you to... Let's get into your red brief, because I have a gripe, as I did with your opposing counsel, and that is on page 54 your footnote 11 in which you reference the argument that Wyvend makes attacking your expert. And it's about the moving portions of a chart around. Yes, Your Honor. And what gripes me about that is it says the reference simply explains that the acronym AB means access first, a key piece of information. You just slough it off. And I went and looked carefully at it, and yeah, you could say that, but you can't say that without acknowledging that what the expert did was modify evidence. And if you had come in and said to me, yeah, you modified evidence, but it really didn't harm anybody. It was an attempt to make it clear, and that's all it was trying to do, I might well have bought it. But what I didn't like was that footnote that says, oh, that's all this was. Because I thought it was misleading. And so that's why I'm raising it with you. Well, I certainly take the criticism, and you know, we certainly weren't trying to do anything that the expert wasn't trying to do. No, no, I take the criticism. I won't say anything more than that. I think what I would say more broadly about, and I guess I'll start with the infringement issues, I mean, I think the logical place to start would be with claim construction. And I think that the district court got this exactly right. But we just want to hear claim construction from him, and since you have three minutes left, it doesn't make any sense for you to waste any of it on that. Alright, I mean, I'm instructed by this court's cases to start with claim construction. But once you construct it in the way that the district court did, then I think this becomes a very straightforward case. Because what we have is a buffer status report. It's not a request, and the difference is not just semantics. Because at the broader level here, you have one technology that tries to do some of the allocation decisions with the handset. You have our technology where that decision is being done by the base station. And the difference gets to the whole difference, actually, between a report and a request, and it gets to whether or not what's being requested is bandwidth, and it gets to whether you can identify it in the request. And I don't think you can do any of those things, and the reason I think it's... I'll start with report versus request. If I've got a process where ultimately somebody else is going to make a decision based on an input, what I'm looking for is a report of that input. And that's what the buffer status report does. And the thing that makes the milk sort of analogy work is because he's assumed that his family's got unlimited resources to buy the milk. If they were resource constrained, as all of these systems are, and somebody said, I'm out of milk, then that would develop a process about whether you can afford the milk, whether you're also out of eggs, whether you really can just respond in that one-to-one basis. And that's the fundamental difference between these technologies. Those decisions are being made by the police station in the accused province in the LTE standard. And that's why it is just a report. And it's not a request. And what it's a report of is bytes. And those bytes are just individual pieces of data. They're not data transmission resources. And they're certainly not data... Go ahead. What is the point of the reference to the bytes if it's not to request banning? It's, I mean, it's starting a process that, I mean, it's reason. I'm not saying it's irrelevant to a request, but it's not a request. It's a report. And I think that gets to this difference between if you have a product that basically is doing the calculation about exactly what it needs and when it should get, you make a request. If you are giving input to the decision maker who's going to decide it based on a multi-factor algorithm, what you give it is a report. And obviously, you get the buffer status report even when you have zero. And that doesn't seem... that seems like a report, but sure doesn't seem like a request. And you can twist yourself in knots and say, well, it's a request for zero bytes of data, but I don't think that really gets it done. I think it just shows what you have here is a report. And it's also, as I said, you know, if you... The engineers who do this start out by setting up a protocol. And initially what they want to do is set up a handshake protocol or a handoff protocol or whatever you care to call it. And it's different than transmitting data. Well, I mean, you know, that may be more relevant to being in validity theory than it is to this particular question. But as to this particular question, you know, what they ask for, what that patent covers is something where you identify in the bandwidth of request the amount of data requested. And that's just not how the buffer status report works. That work is done by the base station. At best you could say that the base station derives its ultimate allocation from the information in the buffer status report. But identify in and derive from are very different concepts, and they map onto the fundamental different concepts between the two pieces of technology, the two approaches to this. And I realize I have about 26 minutes. I have no time left. What do we do with the fact that there is an expert testimony that says that this is a patent officer request, whether it's under literal infringement or a doctrine of equivalent? And our question has to be could any reasonable jury conclude that this is effectively a request? I mean, I think the answer is no. I think, you know, as one of you put it before, the standard is, is there a genuine dispute of material fact? And the fact that you can get an expert to say something conclusory is not, I don't think enough to create a genuine issue of material fact. And I think on this particular point I mean, you know, on this issue we have three different theories any one of which is sufficient for us to win. So suppose I call a restaurant and I say I have seven people. Do you have room for seven people in your restaurant? That's like what's going on here. Not exactly because I say I have this much bandwidth. I understand the nuances of the technology, trust me. But what if I call a restaurant and I say I have seven people. Do you have room for seven? Isn't that a request for a reservation? Close enough that maybe I don't decide it because it's a question of fact. Well, I mean, the way I hear your hypothetical question it first has a report and then has a request. No, I call the restaurant and say I have seven people. That's a report. And then you say, do you have room for us? That's a request. And I mean, I don't mean to be pedantic about it, but that's the fundamental difference between a report and a request. And it maps onto the technology because if I'm just looking for an input from somebody I ask them for a report. So the call says I'd like to come over with seven people. That's a report too. It is. And I think, you know, and I have to know, well, when and why? I mean, you know, and maybe if I'm a restaurant I don't have to ask why, but I at least have to ask when. And that's, again, I think it maps onto the differences in the technology. If you're expecting the handset to do the work you want a request because they've already done the work. If you want the base station to do the work based on an algorithm and a bunch of other factors then you make it a report. And that's what it is. But I don't want to get completely I'm sure Mr. Powers is going to argue what he did in his reply brief, which is that you're misunderstanding the claims because the claims actually do talk about the base station doing the work. Well, I don't know that that's what he'll say, but maybe he will. My law clerk just gave me an excellent hypo. The restaurant one was mine to take credit for, but he just corrected me and said that he can make my hypo a little better and more on point. So let me give it a try. You call and tell the restaurant I call and I say, I have people. I don't tell them how many, because that's what happens here. You've got a painting and the restaurant says, how many? You say seven. And that's what happens here. You've got a back and forth. They ping, oh, tell us how many, oh, you say seven. The restaurant says, here's a block for seven people to eat in tonight if you'd like to come. Doesn't that feel like your transmissions have amounted to a request? Because that actually, better than mine, actually corresponds to the back and forth that goes on here between the two recipients. But doesn't that sound like a request? No, I mean, it sounds like a report, and it seems like, you know, you expect the restaurant to figure out, you know, they'll look at their resources, but they'll also look at who else is requesting. They'll also look at a variety of other factors and then maybe they'll tell you, yeah, you can come. Or maybe they'll tell you, we can come at nine, but not at seven. Which does get back to, you know, the idea that you just have to have the time component to this, or it doesn't make any sense. I mean, you know, if I tell you, you know, if I ask you, how many cars can be on a highway? I mean, if you don't tell me, like, during an hour, during a day, during a week, it's a meaningless question. I actually thought you meant at the same time. Go ahead. What? I didn't actually see a time component in your particular question, but I get it now. Yeah, well, I mean, I think the answer would, you know, depend on whether it's in a specific time, or whether it's in an hour, or ten minutes, or a day. If you ask how many cars can you have on the beltway, I mean, you might think just at one time. You might think, well, you know, at rush hour, for an hour. So it seems to me that time component is inherent. Can you jump over to anticipation for just a couple minutes, because we're so far over and I'm begging on the indulgence with my colleagues to hear you out. I'm waiting to hear about how many angels can dance on the head of a pen. At what time interval you're on? So, on the anticipation issue, I mean, I think Judge O'Malley has essentially put her finger on at least an aspect of this, which is, look, you know, the district court judge essentially is asking the question, what would a physician, a person skilled in the art, a practitioner skilled in the art, take from Mouly on this question of whether or not, when you have an asynchronous handover, whether you can do it, whether you do it on the ratch, or whether you do it on a dedicated channel. And everybody in front of them, our expert, MIND, and the two other later patents, all of them say, you do it on a ratch. And when pressed, they tell them, you do it on a ratch, because there's no other way to do it, because... Mouly doesn't actually say that, though, right? Mouly never says you send the handover signal on the ratch. Regrettably, not in any one sentence. But I think the district court had this right. When you read the entirety of Mouly, when you understand that he's basically saying that access firsts go on the ratch, and then he later says, okay, well, you know, you have asynchronous and you have synchronous, and then there's one kind of access first that goes on a dedicated channel. I think he's clearly referring there to the synchronous. He's clearly excluding I mean, I wish it were clear, but he's excluding the asynchronous. The trial court pointed to page 372 of Mouly, and I know that your friend on the other side says that that wasn't fair because you didn't argue it. But it's still in the reference, and it says the RIL3 RR channel request message sent on the ratch is very short and deep. Its useful signaling information consists of just 8 bits. How is that not saying that it's sent on the ratch? I think that's maybe one place where it is, but I guess, you know, the way I've read Mouly, anyways, is that if you read all of the various references, you know, he either makes a nonsense statement at 410 that they think is so critical, or it makes although it's a little imprecise, it makes perfect sense, which is the way this works is that you essentially can't use the dedicated channel until you synchronize, and so the general rule is that access firsts go on the random access channel, and there's essentially one exception to that, and that's when you've pre-synchronized, and in that circumstance, you don't have to have the access firsts on the ratch. You can send them on the dedicated channel, but in every other circumstance, if you try to do it on the dedicated channel, it's going to get you exactly what you're trying to avoid here, which is you're trying to avoid drop calls and confusion of people being on the same channel, and the way you avoid those collisions is you have a special channel that deals with the situations where you're not synchronized, and that's the ratch, and that is what you need to use for the asynchronous handle, and that's why when Min is pressed on this in his deposition, and he's cross-examined, he does say repeatedly, and once it's in response to a hypothetical, but it's a fair hypothetical, and other times it's just flat out, there's just no way to do it. You need to have the synchronization before you can use the dedicated channel. In looking at the GSM, I understand that you say that we're supposed to be looking at Muli, and so the underlying thing that Muli's supposed to be talking about isn't really appetite, but it's still relevant, because if we're trying to figure out what Muli's saying, we ought to be looking at the underlying document that it's saying something about. So, Mr. Powers relies on the 3.4.4 .2.2 non-synchronized cell and he says that in that instance, it says that you're on a dedicated channel. Now, I pushed him on what the first clause means, but can you explain to me how you would get to a dedicated channel if you're not synchronized? I can't, Your Honor, and I don't think anybody can, which I think is exactly why MN basically concedes as much, that you can't. You need to have synchronization before you can use the dedicated channel. What is the GSM saying there? Well, that particular specification, I think there's some ambiguity in that specification, to be perfectly honest, because if I'm thinking about the same thing in place, it says, you know, on the main DCCH, but then it says that, you know, it's doing it in random mode and does not follow the basic format. So, I don't know if that's just a different way to sort of talk about a ratch. I mean, you know, the reality of MULI is what MULI's trying to describe is not every spec in the GSM. He's trying to describe GSM the way it's actually been implemented. And so, I think if you have some ambiguity in the GSM spec in one of them, and there's thousands of them, you get a little ambiguity there, I don't think that's enough to make MULI not anticipatory. And after all... Well, you don't just have an ambiguity in the GSM spec, you also have an ambiguity in MULI itself, because that one sentence says in both, and it clearly is referencing synchronous and asynchronous. I don't know why it says it. It may be technically inaccurate or wrong, but I'm just a little nervous that I'm not the one to make that decision. Maybe a fact finder ought to make it with a thorough vetting of the issue. Two basic responses. One is... You basically admitted it's like ambiguity squared. We've got ambiguity in the underlying document, now you think I should rely on all the deposition testimony even their expert, which indicates that that sentence can't really mean what it says it means, because if it does it's sort of inconsistent with the technology and how it operates. And I understand all those facts. There is a reference to this GSM stuff on 2424, and this you've just admitted also has what appears to be some ambiguity vis-a-vis what you'd like to see happen in this case. So I'm a little nervous about the extent of the ambiguity on a fact question. And here's the thing, Your Honor. First of all, I mean, certainly I don't think, and I didn't hear you saying, but just to be clear, I don't think that this is unambiguous in the way that my friend wants to have it say. You know, when it says this message is the only case where short-access verse are used on a dedicated channel, I don't think he's clearly covering both in an unambiguous way. And then I think, as the district court did, if you read Muley as a whole, what makes sense is he's at any time you use this, you can have an unclear antecedent, and it's got to be a synchronous handover. But more to the point, here's what I think is not ambiguous, and here's the reality the district court is facing. He's facing this conundrum that it doesn't seem like there's any way that you can have an access burst over a dedicated channel before synchronization. He sees that, and then he sees our experts say that, he sees MN can see that, and then he looks at these two patterns, and one of them referring to Muley specifically says, yeah, an asynchronous handover, the handover comes on the routch. And the other one, although it doesn't reference Muley specifically, in describing GSM says exactly the same thing. So he's got four people skilled in the art who are all saying the same thing. He's got nobody on the other side of that, and that seems to me a pretty good definition of the absence of a genuine dispute of a material issue of fact. And I'm taxed your patience long enough. That's great. Thank you, Mr. Clement. Mr. Powers, I want you to do five minutes of rebuttal. I'd like to begin with Muley, if I may. On Muley, the standard is clear and convincing evidence. And Mr. Clement just said he wished it were clear. Muley never says once that in asynchronous or synchronous, the handover message is sent on the rouch. Never says it. Says quite clearly in both, it's sent on a dedicated channel. Well, your complaint about the trial court relying on portions of the reference that you all didn't focus on, but the reference says on the text. And frankly, the district court's allowed to read the entirety of the reference. Of course. My point is that the district court did that without the benefit of any expert testimony or help and was speculating about what it meant. But when you say it never says it, it says it right there. No, it doesn't. I, with respect, Your Honor, there's three things I'd like to direct you to that I think are squarely inconsistent with that and say exactly what we're saying. The first is A2409. A2409, this is Muley at 410, says, in the case of synchronous handover, the mobile station first sends a few access bursts and then starts normal transmission by applying the computed timing advance. If the handover is an asynchronous one, A2409, I can't find what you're reading. It's not following. Are you on the right page? This is what A2409 looks like. It's got a giant diagram at the top. Where are you? Okay. Okay, there you go. If, then continuing, if the handover is an asynchronous one, the mobile station continues to send access bursts until it has received the actual timing advance to apply. Now, the question then becomes, so that establishes that the handover reference is sent before the timing sequence is provided. And so then the question is, for that handover, in synchronous or asynchronous, is it being sent in a dedicated or a RETCH? That's provided also at A2409. In both cases of synchronous and asynchronous, the access message only contains an 8-bit handover reference. This message is the only case where short access bursts are used on a dedicated channel. It's not just one sentence. It's saying explicitly, that's how it works. But that's it, though. That's all you have. No, no, no. You're expert, and the expert on the other side, and I disagree with whether or not the court could even look to others in the field, but everybody interpreted this to say that to get to the dedicated channel, you've got to use the random access channel. With respect, I disagree, Your Honor. So A2399 A2399 and A2409 have two figures that lay out how you establish a channel and when the timing sequences apply. They're two figures that should be read together, and those two figures lay out a process, a complicated one, admittedly, but those two figures lay out and make quite clear that the handover occurs before the timing sequences. The timing sequences are on A2409, and the handover is being done on A2399. But you just admitted to me before that 6.37 shows that the handover has to occur before the physical information is sent back. And before the dedicated channel is set up. No, I don't agree with that. I did not agree with that and do not. This is what A2399 and A2409 mean, and that figure is not to the contrary. Can you cite to me any expert testimony or anything other than your view that there's some ambiguity in Mooney that shows me how you could how physically it would be possible to set up a dedicated channel in an asynchronous handover without having had some exchange first. The details of that are not, as I understand it, in the record but the conclusion is. The conclusion squarely is that you're doing... Do the details of that exist anywhere? Why aren't they in the record? Well, they are in the record in this sense. The notion that you would be asking us to send something back just because you think there's a few sentences in a prior reference that you think are confusing when you know full well that it's physically not possible. I disagree that it's physically not possible. A2399 and A2409 tell you how it's possible. That lays out the sequence of events that makes it work. And it's not a confusing aspect of Mooney. It's an unambiguous statement in Mooney. They're sent on a dedicated channel in both. That's what is said. That is not confusing. And to say it is clear and convincing that that clear statement in Mooney is wrong as a matter of law, I think that turns summary judgment law and anticipation law on its head. With respect then, I'd like to turn and the GSM spec. I can give you one minute on MSL but you're way out of time. So one minute if you want to talk about Mr. Clements' MSL argument. I do. The purpose of that provision is well established in our prior argument and Your Honor's opinion. It's not a land-grab gotcha. It was a fail-safe provision that says we were talking about four patents. We think those are the only four patents that are relevant. Here's the problem. The Texas court said that it can't be triggered. The MSL provision can't be triggered by an after-acquired patent. True. And the Florida court says yet it can and all the rest of the stuff I've figured out as it relates to what the provisions mean. True. We affirmed the Texas court, reversed the Florida court on the threshold question and did not reach the follow-up question. So how is it that you can say we did anything other than decide what triggered the MSL provision? I'm certainly not in a position to tell Your Honors what you were deciding. I was merely reading the statement. We're past that now. You said you didn't reach it. So now I'm arguing not that you previously decided. Well, I'm arguing to you that I think that there's pretty good language that says we didn't reach it. I don't know what my colleagues think about that. With respect, I think a fair reading of it could go the other way, but we're past that. I'm obviously taking Your Honors' statement that you didn't decide it. But the rationale of your decision clearly decides the same question. So, for example, the main argument made by Erickson is a product language. That is exactly the same argument that they made with regard to the covenant not to sue. And Your Honors rejected that because for the same reason that it should be rejected here, which is it's clearly related only to the patents, the four patents. The only point of this clause, and that was, I think, very clear, the only point of this clause that we're talking about, the in the any event clause, is that if we're wrong that those four are the only four, if there was a fifth that should have been included in the four. Because this licensing agreement was really about those four patents to give them rights to those. If we're wrong about that and there's a fifth, you're going to get the rights of the fifth too. That's what the purpose of this clause was. And with regard to the Why are you saying that it's the purpose of the clause, but why don't you focus on the language of the clause? Because if we're going to be getting into the purpose of the clause, according to Matt Powers, I feel like I would need parole evidence to decide that. You didn't need parole evidence in the first case to decide exactly the same question on the covenant not to sue. It was the same argument. Products is being used. They made exactly the same argument to you there that they made to you here. And you did reach that issue on the covenant not to sue for exactly the same reason that you should reach it here. And it's exactly the same reason Judge Moore, that you articulated, which is it's a single clause. It's one sentence. You can't read them as if it were two sentences, one totally divorced from the other. And read as a single clause, the same argument that your honors used to decide the first question. You didn't send it back. You decided it. That same argument applies here with equal force. Exactly the same reasoning. Exactly the same result. You've got three separate clauses. The one that was limited to those four patents. Then you've got the damages clause that talks about all the other patents that clearly claim the compliance process. That was the clause that was designed to do that. And now you've got another clause. Right. And you've asserted an entirely different patent against someone else as it relates to compliance process. Yes. And you say in your brief, you argue that, well, maybe what we're talking about in this clause is that you could have some products that aren't compliant that would still violate that patent. And that's what we're giving them a license to. That's what we would give them the most favored license to. What we're giving them is if we were wrong about the four. If there were, because everybody thought there were just four that were relevant. And that's what this part of the agreement was designed to be other than damages. And damages was narrow and your honors have construed that and understood it. Well, damages was much broader because it talked about any other patent. It's broader because the patents narrow us to release. And all this clause was doing was saying if we were wrong about the four and a fifth pops up, we're going to treat it as if it was one of the four. That was what this clause was about. But why do we have felony products broadly listed as opposed to simply those that are compliant? Same reason you did in the covenant not to sit. And same result based on the same reasoning. You had the same language there. That was products based as well. Let's just assume I don't remember what you're talking about regarding the covenant 92 because I've had 5,000 cases between then and now. Why don't you tell me what the same reason is that ought to be persuaded to us? Exactly the same reason that your honor was using in your colloquy with Mr. Clement which is it's a patent based grant and the only discussion of patents that's relevant is proceeding in the same sentence and you have to read it as a whole. You can't separate it and read it divorced from the context of the part that came before and reading it as a whole as your honors did in Ylan 1 the same result on this clause on this sentence should be in the same result as in the covenant not to sue which has the same issue. So the rationale is the same. Well so your view is that only the patents that get licensed for LME products right? Yes that's the in the event in the event is if we find that there's one that isn't that we left off that's what you get. That's what the in the event is referring to and your honors did construe that because that would then be the other patent. Right that was not known at the time but that was that meant we weren't just talking about the four patents we were also talking about the ones that were referenced in the damages provision. No this is in the event that there's another one that could be asserted against the same product. Why did you give such a broad license to Bel Air? Why didn't you just give Bel Air the license on the patent that you asserted? I can't speak to that it was a very small Canadian company and the circumstances were obviously quite different so it was a it was an inconsequential meaningless company and they did a deal that wasn't very well thought out apparently. I can't speak to that. Okay are you okay Mr. Clement is there anything you'd like to say? Obviously we ended the MSL cross appeal issue. We gave him five minutes if you want five minutes you can have that too. Yeah we'll see if I need it but limiting myself to the cross appeal rebuttal I think I'll really focus on the one argument he made which is that you've already decided this in the context of the non-assert provision and I think that's wrong for a couple of reasons. I mean first of all I've gone back and re-read that opinion and as I understand the non-assert argument first of all the text is different and in that context one of the problems that Erickson's argument had is that if you accepted our argument about products there it would tend to read the damages provision as null and if anything the polarity on that is reversed now because I'm just not sure that the damages provision would have much force if you accepted his reasoning. I also don't think that the provision would have much force and I'll get to that in a second but I do want to say first of all the context is different because in the non-assert context if you accepted Erickson's reading of products you'd create another problem in interpreting the agreement as a whole and that's just not present here at all so it's not the same reasoning second time around. The second thing is the language isn't even the same and again one of the problems I think in Erickson's argument the first time around and I guess it's easier for me to say that because I wasn't here the first time around is the language is different and in the middle of section 3.1 which is the non-assert provision there's a reference to LME products or components thereof infringe any patent and that's one instance where when you're talking about the products and you want to tie them to specific patents you add language that does that and you just don't have the same language when you get to the critical provision here the MFL where it talks about products unmodified but it's worse for them than it's just unmodified it's in capital letters for a reason all the references to capital letters are to defined terms. If you go to the definition LME products means what it sounds like it means. It means LME products and their principle protection against giving us a portfolio license based on this triggering patent is their ability to control the terms that they negotiate with any other party and at the point that they've given... Even when you keep using this term portfolio license that to people of skill and the art a portfolio license is a license to all patents related to this portfolio i.e. this but the way you've suggested this clause should be read is actually remember the dishwasher discussion your idea of a portfolio doesn't comport with your proposed interpretation of this clause because a portfolio is understood to be a portfolio of patents related to a particular technology but you've said I need to read this clause so broadly that if there is a triggering patent then there are unrelated patents pertaining to dishwashers you also get a most favored treatment for those too. Those wouldn't be in the same portfolio. The dishwasher patents could not possibly be in this portfolio in the way that normal people would understand that term at least I don't think so that's why I'm having trouble with your argument because it creates such a broad incredibly broad reading for this We're not in the dishwasher business Bel Air is not in the dishwasher business so in the context the portfolio licenses comport with both ways It does Well I think they're principally in this space but I could be wrong about that but the point is we're not asking for something that they haven't given somebody we're asking for what they gave Bel Air and in that context I mean again I'm not quite sure at the end of the day I mean your question almost sort of sounds like in the absurdity canon that they just couldn't possibly have given a license this broadly but they have we're not asking for anything they haven't given Bel Air To be clear it's not that the contract is written in a way to be absurd because it's so broad it's whether I should use the first half of the sentence to modify the second half of the sentence you say no, you want me to treat them like two different countries and he says the second half of the sentence is limited to what's at issue in the first half of the sentence and so to be fair I don't think it's in the absurdity camp I think it's in the camp of does a single sentence track all the way through or is it really two distinct things and fair enough but if I have a sentence that says if patents comma then products I don't think you read patents through to limit products to only those products that include that patent and if you look at the agreement as a whole there are other places where they talk about products involving the while in patents by meaning the for and just to finish on this my friend Mr. Powers talks about whether the patent could arise as if it's a hypothetical, it did they don't concede that there's a trigger based on a pre-existing patent and so it's just a matter of interpreting that language and when it incorporates a defined term it's a broad term and then they give the same thing to Bel Air, seems like that's what we're entitled to. Thank you your honors. I thank both counsels, the argument was very helpful, it's a complicated case thank you for being so well prepared to conclude the argument. All rise I'm going to report for adjournment from day to day